UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**JUDGE PALLMEYER**

UNITED STATES OF AMERICA

**FILED**
Feb 1 2005
FEB - 1 2005
2005

**05CR0093**

No._____

v.

Violations: Title 18, United States Code,
Sections 371, 1014, 1343 and 2

JOHN BRINCAT, SR.

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

COUNT ONE

**MAGISTRATE JUDGE NOLAN**

The SPECIAL AUGUST 2003-1 GRAND JURY charges:

1.      At times material to this indictment:

        a.      Mercury Finance Company (Mercury Finance) was incorporated in Delaware and had its principal offices in Lake Forest, Illinois. Mercury Finance was primarily in the subprime lending business, extending loans directly to customers and acquiring installment loans previously extended to customers by dealers of used automobiles. Mercury Finance's loan customers generally were higher risk borrowers known as subprime borrowers. Mercury Finance also offered credit insurance products to the public and engaged in a credit card business.

        b.      Mercury Finance had approximately 290 loan offices located in various parts of the United States. Each loan office was managed by a branch manager, who in turn was supervised by a regional director. Regional directors were supervised by group vice presidents, who all reported directly to defendant John Brincat, Sr.

### The Defendant

        c.      Defendant John Brincat, Sr. (John Brincat) was the chief executive officer and, in July 1996, also became the chairman of the board of directors of Mercury Finance. The defendant was responsible for managing the day-to-day operations of the company. Defendant John Brincat also signed Mercury Finance's quarterly and annual

reports filed with the United States Securities and Exchange Commission, representing that the contents of the reports were true and accurate.

      d.    Defendant John Brincat had an employment contract with Mercury Finance. This contract provided, in relevant part, for a guaranteed annual base salary of $300,000 in 1994, $360,000 in 1995, $ 430,000 in 1996 and $520,000 in 1997. In addition, the contract provided for an annual incentive bonus equal to 1% of the company's net after tax earnings. The contract further provided for another bonus, sometimes referred to as a super bonus, based upon annual increases in net after tax earnings, only after earnings exceeded 20% over the prior year, in pertinent part as follows:

        1.    earnings per share increases of 0% to 19.99%, no additional bonus.

        2.    earnings per share increase of 20% to 29.99%, additional bonus equal to 2.5% of the amount of increase from the prior year.

Moreover, in any year earnings exceeded the prior year's earnings by 20%, the contract provided for the defendant to receive a vested stock option for 750,000 shares of the company's stock at $11.58 per share.

      e.    Mercury Finance reported more than 20% increases in earnings for 1994, 1995 and 1996. As a result, defendant John Brincat received a total cash bonus in 1994 of $1,438,670 and in 1995 of $1,618,121. In 1996, the defendant earned, according to the terms of the contract, a cash bonus of $1,745,910, only $244,760 of which the defendant actually received. In addition, for each of these years, the defendant earned, according to the terms of the contract, a stock option for 750,000 of the company's shares at $11.58 per share.

## Stock Options

f.      As a part of their compensation, certain other Mercury Finance employees, in addition to defendant John Brincat, from time to time received options to purchase Mercury Finance common stock at a specified price, usually after holding the option for two years. The value of these stock options depended on the market price of Mercury Finance's common stock. For instance, in or about June 1996, defendant John Brincat exercised 800,000 options he had previously received through his employment to purchase Mercury Finance stock at $3.73 per share. Since the market price of Mercury Finance stock was over $12 per share at the time he exercised the options and purchased the stock, defendant John Brincat had a taxable gain of approximately $7,400,000 on the transaction. Similarly, in 1995 defendant John Brincat exercised a total of 1,280,000 stock options he had previously received through his employment resulting in a taxable gain to him of about $10,965,319.

## The Company's Stock

g.      Mercury Finance was a publicly-held company with its common stock listed and traded on the New York Stock Exchange. By early 1996, it had approximately 177,700,000 shares of common stock outstanding with a market value of over $2,000,000,000. Mercury Finance paid dividends on this stock and defendant John Brincat received dividends of $445,000 in 1994, $635,000 in 1995 and $800,000 in 1996 on the Mercury Finance stock he owned.

h.      Mercury Finance was required to publicly file with the United States Securities and Exchange Commission quarterly reports with unaudited financial information on Form 10Q and annual reports with audited financial information on Form 10K.

3

Securities analysts, rating agencies, lenders, and purchasers and sellers of Mercury Finance's common stock and commercial paper used information contained in Mercury Finance's publicly filed reports and other information made available by the company in making investment, credit and rating decisions. Federally insured banks were among the lenders and purchasers of Mercury Finance's commercial paper.

The Subprime Loan Business

i.  Mercury Finance funded its lending operations in part through obtaining loans and other credit extensions from financial institutions and others and through the sale of commercial paper on almost a daily basis to financial institutions and others. Commercial paper refers to a type of short term debt issued by Mercury Finance. By in or about 1996, the company had nearly one billion dollars in long term and short term debt with additional loan funds of approximately $600,000,000 available to it. Mercury Finance's costs of obtaining these loans and credit extensions and the pricing of its commercial paper and common stock were determined in part by the ratings Mercury Finance received from rating agencies.

j.  The difference between what it cost Mercury Finance to obtain funds and what Mercury Finance charged its customers to borrow funds, also known as the net interest rate margin, in large part determined the profitability of Mercury Finance's operations.

k.  Mercury Finance's primary assets were its outstanding loans to customers. The value of those loans depended on their collectibility. Therefore, the number of delinquent loans and uncollectible loans were important factors in determining the quality and value of the company's primary assets.

4

     l.     Mercury Finance had written policies defining when a loan was delinquent and when a loan should be charged off. The company reported these policies to the public on at least a quarterly basis.

Proposed Acquisition

     m.     From time to time, Mercury Finance acquired other businesses. On or about January 10, 1997, Mercury Finance publicly announced that it had agreed to acquire Fidelity Acceptance Corporation (Fidelity Acceptance) from Bank Boston Corporation (Bank of Boston), a financial institution whose deposits were insured at the time by the Federal Deposit Insurance Corporation. Fidelity Acceptance was also in the subprime lending business. The acquisition price was to be $1.1 billion, which included 32,708,333 shares of Mercury Finance common stock based on a market price of $12 per share plus the assumption and refinancing of approximately $730,000,000 of Fidelity Acceptance's debt. Mercury Finance engaged a New York-based investment bank to assist in the acquisition of Fidelity Acceptance, including the refinancing of the approximately $730 million in debt. As a part of its responsibilities, the investment bank assisted Mercury Finance in arranging a syndicate of banking institutions to provide the funds for the refinancing.

     n.     In or about mid-January 1997, Mercury Finance, with the assistance of the investment bank, sought the participation of over twenty banking institutions in the loan syndicate. Most of these banking institutions, including Bank of America, Morgan Guaranty Trust Company of New York, First Chicago and NationsBank, were financial institutions whose deposits were insured at the time by the Federal Deposit Insurance Corporation.

5

o.     During the period from on or about January 14, 1997 through January 23, 1997, Bank of America, Morgan Guaranty Trust Company of New York, First Chicago and NationsBank each committed to provide $200,000,000 to Mercury Finance in connection with the proposed acquisition, with the understanding that these institutions would in turn seek the participation of other financial institutions in providing the committed funds.

p.     On or about January 27, 1997, Mercury Finance sponsored a meeting at the offices of its investment banker at the World Trade Center in New York City for the purpose of explaining the acquisition of Fidelity Acceptance and inviting other banking institutions to participate in the loan syndicate.  Representatives of more than twenty banking institutions were invited, including the four banks which had already committed funds.  Prior to this meeting, all of the invitees were provided with a Confidential Information Memorandum, which included financial information for the period ending September 30, 1996.

### January 1997 Earnings Disclosure

q.     On or about January 23, 1997, Mercury Finance publicly disclosed that its net earnings for 1996 were approximately $120,700,000, an increase of $21,800,000, or 22%, over the previously disclosed net earnings for 1995 of approximately $98,900,000. On the same day Mercury Finance publicly disclosed its 1996 net earnings, the price of its common stock rose to a fifty-two week high of $16 per share on the New York Stock Exchange.

r.     The closing price of Mercury Finance common stock on January 28, 1997 on the New York Stock Exchange was $14 7/8 per share.

6

## Disclosure of Accounting Irregularities

s.     On or about January 29, 1997, before the opening of the New York Stock Exchange, Mercury Finance issued a press release stating that accounting irregularities had been discovered, that Mercury Finance's principal accounting officer, James Doyle, had disappeared and that Mercury Finance's net earnings for 1996 were actually about $56,700,000, rather than the previously announced approximately $120,700,000. Mercury Finance also announced in the press release that its net earnings for 1995 were approximately $76,900,000 rather than the previously announced approximately $98,900,000.

t.     Based on Mercury Finance's announcement about accounting irregularities, the New York Stock Exchange suspended trading of Mercury Finance common stock before the market opened on January 29, 1997.

u.     On or about January 29, 1997, Mercury Finance applied for and obtained a $10,000,000 unsecured loan from Bank of America for the purpose of redeeming a portion of its maturing commercial paper.

v.     On January 31, 1997, when trading in Mercury Finance common stock resumed, the price of Mercury Finance common stock fell from $14 7/8 per share to $1 5/8 per share and closed the day at $2 1/8 per share on a trading volume of about 42,000,000 shares, making Mercury Finance common stock the most actively traded stock on the New York Stock Exchange for the day.

w.     On or about October 10, 1997, Mercury Finance publicly announced a further restatement of its earnings. Instead of the originally announced $120,700,000 in earnings for 1996, the company ultimately declared a loss of about $30,000,000. This

translated into a reduction of approximately $150,000,000 in the initially announced earnings figure.

## Other Persons Involved

x.    James Doyle, now deceased, was the Chief Financial Officer of Mercury Finance and reported to defendant John Brincat.

y.    Accounting Manager and Assistant Vice President Lawrence Borowiak reported to James Doyle.

z.    Treasurer and Assistant Vice President Bradley Vallem reported to defendant John Brincat.

2.    Beginning no later than in or around January 1994 and continuing until at least in or about February 1997, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BRINCAT,

defendant herein, and others both known and unknown to the grand jury, including James Doyle, Bradley Vallem and Lawrence Borowiak, devised and intended to devise and participated in a scheme and artifice to defraud the investing public, financial institutions, the company's board of directors and others, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and material omissions, which scheme affected financial institutions, in violation of Title 18, United States Code, Sections 1343 and 2.

3.    It was part of the scheme to defraud that, in order to obtain sufficient financing to fund Mercury Finance's operations, to reduce the company's cost of borrowing funds, to inflate the company's stock price and the value of its assets, and to obtain

8

personal benefits in the form of salaries, bonuses, and stock options, defendant John Brincat, James Doyle, Bradley Vallem, Lawrence Borowiak and others engaged in a scheme to make and cause to be made material misstatements and omissions and to create and cause to be created materially false pretenses about Mercury Finance's earnings, receivables, delinquencies and charge offs. The scheme to defraud had three primary components: (1) manipulating earnings figures to meet the investing public's expectations; (2) fraudulently holding the charging off of nonperforming loans; and (3) creating phony financial figures. The defendant stood to benefit the most from the scheme to defraud since he was the only employee of the company with an employment contract providing for a bonus of cash and stock options based on the increase in the company's net earnings over the previous year.

<u>Manipulation of Earnings</u>

4.      It was further part of the scheme to defraud that defendant John Brincat and James Doyle, with the assistance of Lawrence Borowiak, engaged in the practice of fraudulently manipulating the amount of earnings Mercury Finance publicly reported by artificially adjusting the amount of revenues in so-called cushion accounts or cookie jar accounts purportedly set aside to pay future expenses. However, the defendant and James Doyle did not intend for the funds to be used to pay expenses. Rather, they used the funds to artificially manipulate Mercury Finance's earnings to meet earnings projections. This practice began as early as the early 1990's.

5.      It was further part of the scheme to defraud that defendant John Brincat and James Doyle, with the assistance of Lawrence Borowiak, fraudulently used so-called cushion account or cookie jar account funds to conceal nonperforming loans. This was

accomplished by transferring the cushion account funds to branch offices where the funds were deceptively applied as payments from customers, fraudulently concealing the nonperforming nature of the loans and artificially making publicly-disclosed charge off, delinquency, reserve and earnings figures more favorable to the company.

<u>Holding Charge Offs</u>

6.      It was further part of the scheme to defraud that defendant John Brincat, with the assistance of James Doyle and others, restricted Mercury Finance employees in the dollar amount of nonperforming loans they could charge off against reserves or earnings, resulting in the remainder of the nonperforming loans being reported as performing assets in violation of the company's publicly disclosed policies.  The holding of charging off of nonperforming loans in violation of the company's publicly disclosed policies at the direction of defendant John Brincat began in the early 1990's and became systemic by late 1996.  Restricting the charging off of nonperforming loans inflated earnings and reserve figures and misled the investing public, lenders, the company's board of directors  and others about the quality of Mercury Finance's outstanding loans.    This undisclosed fraudulent practice eventually led to Mercury Finance reflecting as performing assets tens of millions of dollars in nonperforming loans, which should have been charged off pursuant to company policy.

7.      It was further part of the scheme to defraud that defendant John Brincat, with the assistance of James Doyle, Lawrence Borowiak and others, restricted Mercury Finance employees in the dollar amount of so-called "repossessions sold" loans that they could charge off against reserves or earnings.  So-called "repossessions sold" were nonperforming loans for which the automobile had already been repossessed and sold by

Mercury Finance. According to the company's publicly-disclosed policy, these so-called "repossession sold" loans were to be charged off in most cases in the same month in which the repossessed automobile was sold. Instead, these "repossessions sold" were held from charge off at defendant John Brincat's direction, resulting eventually in about $26,000,000 of these loans being held from charge off, in violation of the company's policies. This undisclosed fraudulent practice led to inflated earnings and reserve figures and artificially low charge off numbers.

<u>Phony Financial Figures</u>

8.       It was further part of the scheme to defraud that defendant John Brincat and James Doyle, with the assistance of others, created phony delinquency figures and reported them, and caused them to be reported, to the public, knowing that these figures substantially underreported the company's delinquent loans. For instance, in filings made with the United States Securities and Exchange Commission, in press releases, in meetings with securities analysts and in filings made with financial institutions, Mercury Finance reported delinquency figures of around 1% or less, at times when defendant John Brincat and James Doyle knew the accurate delinquency figure was substantially more. The phony approximately 1% figure was substantially better than the rest of the subprime loan industry and even competitive with some banking institutions.

9.       It was further part of the scheme to defraud that defendant John Brincat and James Doyle, with the assistance of Lawrence Borowiak and others, created phony charge off numbers and reported them, and caused them to be reported, to the public, knowing that these figures substantially underreported the nonperforming loans, which should have been charged off against either earnings or reserves pursuant to publicly disclosed

11

company policies. The undisclosed, fraudulent practice of holding charge offs at the defendant's direction made the charge off figures artificially low and correspondingly fraudulently increased earnings and reserve figures.

10.     It was further part of the scheme to defraud that defendant John Brincat and James Doyle, with the assistance of Lawrence Borowiak and others, fraudulently used the so-called "repossessions sold" account to conceal losses from nonperforming loans, which should have been charged off against earnings or reserves pursuant to publicly disclosed company policies. By late 1996, this account had grown to approximately $26,000,000. At or about the same time, with defendant John Brincat's knowledge and approval, the "repossessions sold" account was removed from the company's internal progress reports. Also at or about the beginning of 1997, the approximately $26,000,000 in the repossessions sold account were fraudulently recorded on the company's books and records as performing assets.

11.     It was further part of the scheme to defraud that James Doyle, with the knowledge of defendant John Brincat and the assistance of Lawrence Borowiak and others, created and caused to be created phony earnings and receivables numbers for Mercury Finance.

12.     It was further part of the scheme to defraud that in or about early 1996, in order to artificially and fraudulently inflate Mercury Finance's earnings, James Doyle directed Lawrence Borowiak to add $31,850,000 in accounts receivable to the company's books and records. This $31,850,000 in accounts receivable did not exist.

13.     It was further part of the scheme to defraud that, after outside auditors began

to question the $31,850,000 entry in or about early March, 1996, James Doyle, in order to eliminate the $31,850,000 in accounts receivable without reducing earnings, directed Lawrence Borowiak to reduce short term debt by $30,000,000. Lawrence Borowiak did so, even though there had been no actual reduction in short term debt, specifically in the commercial paper account.

14.     It was further part of the scheme to defraud that, in or about April 1996, in order to convince Mercury Finance's outside auditors that short term debt had genuinely been reduced by $30,000,000, James Doyle gave Bradley Vallem a listing of Mercury Finance's commercial paper account to provide to  Mercury Finance's outside auditors. This listing did not reflect $30,000,000, which Mercury Finance owed Mellon Bank.

15.     It was further part of the scheme to defraud that, in or about April 1996, Accounting Employee A fraudulently altered a Mercury Finance bank statement to reflect phony deposits of $20,000,000 and $10,000,000 and phony withdrawals of $20,000,000 and $10,000,000.  Accounting Employee A altered the document by cutting, pasting and photocopying it.  James Doyle gave the altered bank statement to Mercury Finance's outside auditors to further convince them that short term debt had actually been reduced by $30,000,000.

16.     It was further part of the scheme to defraud that, in or about early January 1997 when the outside auditors became aware that Mercury Finance's reported short term debt was $30,000,000 too low, James Doyle and Lawrence Borowiak, with the knowledge and approval of Bradley Vallem, corrected Mercury Finance's short term debt reporting, but avoided reducing earnings by recording $30,000,000 in phony accounts receivable.

## Fraudulent Acquisition

17.     It was further part of the scheme to defraud the defendant John Brincat and James Doyle, with the assistance of Bradley Vallem and others, provided and caused to be provided to Bank of Boston and others, including banks, in connection with the proposed acquisition of Fidelity Acceptance, information about the financial condition and operations of Mercury Finance which they knew to be materially false and misleading, including earnings, receivable, delinquency and chargeoff numbers.  For instance, on or about December 30, 1996, defendant John Brincat and James Doyle represented to Bank of Boston representatives, among other things, that delinquency and charge off figures for the period ending September 30, 1996 were less than 1%, when both of them well knew that those numbers were phony and that Mercury Finance at the defendant's direction had been holding charge offs in, among other places, the "repossessions sold" account.

18.     It was further part of the scheme to defraud that, on or about January 23, 1997, Mercury Finance, through defendant John Brincat and James Doyle, publicly announced earnings for 1996 of approximately $120,700,000, without disclosing that these earnings were fraudulently inflated, and announced delinquency and charge off numbers of about 1%, without disclosing that these figures were the product of manipulations and did not reflect the actual amounts of loan delinquencies and loans that met the company's publicly-announced criteria for charging off.

19.     It was further part of the scheme to defraud that, on or about January 23, 1997, James Doyle and Bradley Vallem met about the accounting fraud at Mercury Finance, at which time James Doyle showed Bradley Vallem where the documents keeping track of the accounting fraud were being kept.

14

20.     It was further part of the scheme to defraud that, on or about January 25, 1997, defendant John Brincat and Bradley Vallem met and reviewed part of the above-described documents, including those detailing the accounting fraud relating to Mercury Finance's financial condition as of September 30, 1996.

21.     It was further part of the scheme to defraud that, on or about January 27, 1997, defendant John Brincat and Bradley Vallem made a presentation to lenders and prospective lenders concerning Mercury Finance's financial condition, including the September 30, 1996 financial information they knew to be fraudulent.  They presented the financial information without disclosing that the financial information was the product of an accounting fraud that had been intentionally perpetrated at Mercury Finance.

22.     It was further part of the scheme to defraud that, on or about January 29, 1997, after Mercury Finance announced certain accounting irregularities, defendant John Brincat and  Bradley Vallem attempted to and did obtain an additional $10,000,000 in loan funds by falsely representing and causing to be represented that the accounting irregularities at Mercury Finance publicly disclosed earlier that day were overblown, manageable and insignificant.

23.     It was further part of the scheme to defraud that defendant John Brincat and his co-schemers misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, the acts and the purposes of the acts done in furtherance of the scheme to defraud.

24.     As a result of the scheme to defraud, Mercury Finance fraudulently obtained and maintained nearly $1,500,000,000 in loan commitments and lines of credit from financial institutions; the investing public lost nearly $2,000,000,000 in the market value of

15

their stock; commercial paper purchasers lost over $40,000,000; and lenders, including federally insured financial institutions, lost over $40,000,000 on loans extended to Mercury Finance.

25.     On or about November 15, 1996 at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BRINCAT,

defendant herein and others, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce from Lake Forest, Illinois, to Washington, D.C. by means of wire and radio communications, certain writings, signs, signals and sounds, namely the electronic transmission to the United States Securities and Exchange Commission of the Mercury Finance quarterly report on Form 10Q for the period ending September 30, 1996;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TWO

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.      Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated as if fully set forth herein.

2.      On or about August 15, 1996 in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce from Lake Forest, Illinois to Washington, D.C. by means of wire and radio communications, certain writings, signs, signals and sounds, namely the electronic transmission to the United States Securities and Exchange Commission of the Mercury Finance quarterly report on Form 10Q for the period ending June 30, 1996;

In violation of Title 18, United States Code, Sections 1343 and 2.

17

## COUNT THREE

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.     Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated as if fully set forth herein.

2.     On or about May 15, 1996 in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce from Lake Forest, Illinois to Washington, D.C. by means of wire and radio communications, certain writings, signs, signals and sounds, namely the electronic transmission to the United States Securities and Exchange Commission of the Mercury Finance quarterly report on Form 10Q for the period ending March 31, 1996;

In violation of Title 18, United States Code, Sections 1343 and 2.

18

## COUNT FOUR

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.    Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated as if fully set forth herein.

2.    On or about July 18, 1996 in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce between Lake Forest, Illinois and Baltimore, Maryland and other locations outside of Illinois by means of wire and radio communications, certain writings, signs, signals and sounds, namely a telephone conversation with securities analysts and others concerning Mercury Finance's financial condition;

In violation of Title 18, United States Code, Sections 1343 and 2.

19

## COUNT FIVE

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.      Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated as if fully set forth herein.

2.      On or about August 2, 1996 in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce from Lake Forest, Illinois to New York, New York by means of wire and radio communications, certain writings, signs, signals and sounds, namely the facsimile transmission of Mercury Finance financial information to the Den Danske Bank;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.      Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated as if fully set forth herein.

2.      On or about January 15, 1997, in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce from Chicago, Illinois to New York, New York  by means of wire and radio communications, certain writings, signs, signals and sounds, namely the facsimile transmission of a loan commitment letter in the amount of $200,000,000 from First National Bank of Chicago;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SEVEN

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.     Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated as if fully set forth herein.

2.     On or about October 28, 1996 in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce from Lake Forest, Illinois and Baltimore, Maryland and other locations outside of Illinois by means of wire and radio communications, certain writings, signs, signals and sounds, namely a telephone conference call with securities analysts and others concerning Mercury Finance's financial condition;

In violation of Title 18, United States Code, Sections 1343 and 2.

22

## COUNT EIGHT

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.     Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated  as if fully set forth herein.

2.     On or about January 7, 1997 in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce from Lake Forest, Illinois to New York, New York by means of wire and radio communications, certain writings, signs, signals and sounds, namely the facsimile transmission of the Mercury Finance quarterly report on Form 10Q for the period ending September 30, 1996 to the Den Danske Bank;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT NINE

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.     Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated as if fully set forth herein.

2.     On or about January 8, 1997 in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce from Chicago, Illinois to New York, New York by means of wire and radio communications, certain writings, signs, signals and sounds, namely the facsimile transmission of Mercury Finance financial information to Mercury Finance's investment banker, Salomon Brothers, Inc.;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TEN

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

3.     Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated as if fully set forth herein.

4.     On or about January 16, 1997 in the Northern District of Illinois, Eastern Division, and elsewhere,

## JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce from Chicago, Illinois to New York, New York by means of wire and radio communications, certain writings, signs, signals and sounds, namely the facsimile transmission of a loan commitment letter in the amount of $200,000,000 from Bank of America;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT ELEVEN

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.     Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated as if fully set forth herein.

2.     On or about January 23, 1997 in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce between Lake Forest, Illinois and Detroit, Michigan and other places outside of Illinois by means of wire and radio communications, certain writings, signs, signals and sounds, namely a telephone conversation with securities analysts and others concerning Mercury Finance's financial condition;

In violation of Title 18, United States Code, Sections 1343 and 2.

26

## COUNT TWELVE

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1. Paragraphs 1 through 24 of Count One of this indictment are realleged and incorporated as if fully set forth herein.

2. On or about January 24, 1997 in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BRINCAT,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, did cause to be transmitted in interstate commerce between Los Angeles, California and Lake Forest, Illinois by means of wire and radio communications, certain writings, signs, signals and sounds, namely a telephone conversation between Bradley Vallem and an employee of T. Rowe Price concerning Mercury Finance's financial condition;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT THIRTEEN

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.     Paragraph 1 of Count One of this indictment is realleged and incorporated as if fully set forth herein.

2.     On or about December 30, 1996, in the Northern District of Illinois, Eastern Division,

## JOHN BRINCAT,

defendant herein, and others known and unknown to the grand jury, including James Doyle, for the purpose of influencing the action of Bank of Boston, a financial institution whose deposits were insured at the time by the Federal Deposit Insurance Corporation, to enter into a purchase agreement with Mercury Finance in which Bank of Boston was to exchange its ownership of Fidelity Acceptance in part for stock in Mercury Finance, knowingly made false statements to an employee of Bank of Boston concerning Mercury Finance's financial numbers, including that loan delinquencies for the period ending September 30, 1996 were .98% and charge offs for the same period were .86%, when defendant knew that both figures were higher;

In violation Title 18, United States Code, Sections 1014 and 2.

28

## COUNT FOURTEEN

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.      Paragraph 1 of Count One of this indictment is realleged and incorporated as if fully set forth herein.

2.      On or about January 29, 1997, in the Northern District of Illinois, Eastern Division,

### JOHN BRINCAT,

defendant herein, and others known and unknown to the grand jury, including Bradley Vallem, for the purpose of influencing the action of Bank of America on a requested loan to Mercury Finance of $10,000,000, knowingly caused to be made a false statement to an employee of Bank of America, a financial institution with its deposits insured at the time by the Federal deposit Insurance Corporation, namely, that Mercury Finance's accounting irregularities were overblown, manageable and insignificant when the defendant knew Mercury Finance had engaged in an extensive and intentional accounting fraud, in which the defendant John Brincat had participated;

In violation Title 18, United States Code, Sections 1014 and 2.

## COUNT FIFTEEN

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.      Paragraph 1 of Count One of this indictment is realleged and incorporated as if fully set forth herein.

2.      During the period from on or about January 24, 1997 through January 28, 1997, in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BRINCAT,

defendant herein, and Bradley Vallem did knowingly and wilfully, conspire and agree together to commit an offense against the United States, specifically to knowingly make false statements to employees of financial institutions, whose deposits at the time were insured by the Federal Deposit Insurance Corporation, about the financial condition of Mercury Finance during a meeting with bankers for the purpose of influencing the action of the financial institutions on extending loan funds to Mercury Finance in connection with its acquisition of Fidelity Acceptance, in violation of Title 18, United States Code, Section 1014;

3.      In furtherance of and to effect the objects of the conspiracy and to accomplish its purposes and objectives, defendant John Brincat and Bradley Vallem did commit and cause to be committed overt acts in the Northern District of Illinois and elsewhere including:

        a.      On or about January 24, 1997, the defendant and Bradley Vallem had a conversation during which the defendant directed Bradley Vallem not to disclose to anyone what the knew to be the nature and extent of the accounting fraud scheme at Mercury Finance;

30

   b. On or about January 26, 1997, the defendant and Bradley Vallem had a telephone conversation during which they agreed to go to New York to make the presentation to the bankers;

   c. On or about January 27, 1997, the defendant and Bradley Vallem each traveled to O'Hare International Airport for the purpose of traveling to New York for the meeting with bankers;

   d. On or about January 27, 1997, the defendant and Bradley Vallem traveled together from Chicago to New York to make the presentation to the bankers; and,

   e. On or about January 27, 1997, the defendant and Bradley Vallem made presentations to the banker in a meeting in New York, including the presentation of financial information about Mercury Finance they knew to be false;

   In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

The SPECIAL AUGUST 2003-1 GRAND JURY further charges:

1.     The allegations contained in Counts 1 through 12 of this Indictment are realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982 (a)(2).

2.     Based on the defendant's violations of Title 18, United States Code, Section 1343, affecting a financial institution, as alleged in the foregoing Indictment,

JOHN BRINCAT,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), all property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as the result of such violations, including but not limited to the sum of approximately $17,000,000.

3.     If any of the forfeitable property described above, as a result of any act of omission by the defendant:

a.     Cannot be located upon the exercise of due diligence;

b.     Has been transferred or sold to, or deposited with, a third party;

c.     Has been placed beyond the jurisdiction of the Court;

d.     Has been substantially diminished in value; or

e.     Has been commingled with other property that cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the

provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1)(B).

A TRUE BILL:

FOREPERSON

UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

VS.

JOHN BRINCAT SR.

INDICTMENT

Violation:
Title 18, U.S.C., Sections 371, 1014, 1343 and 2

A true bill,

_____
Foreman

Filed in open court this _____ day of _____, A.D. 20___

MICHAEL W. DOBBINS
_____
Clerk

Bail, $ _____